UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

SARITA DAUGHERTY,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )          CIVIL NO.  1:18cv256
                                     )
NANCY A. BERRYHILL, Acting           )
Commissioner of Social Security,     )
                                     )
          Defendant.                 )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB), as provided for in the Social Security Act.  Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for DIB must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2015 (Ex. B-10D).

2.  The claimant engaged in substantial gainful activity but not at all times after the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: fibromyalgia, morbid obesity, diabetes mellitus, diabetic neuropathy, obstructive sleep apnea, arthritis in the knees and feet/ankles, disorders of the back (including retrolisthesis of L5 to S1, a hemangioma at L3, and degenerative and discogenic changes at multiple levels of the lumbar spine with foraminal stenosis at L4-5 and L5-S1 and lower extremity radiculopathy), anxiety/panic disorder, and depression (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she needs a sit/stand option and she is not able to climb ladders, ropes, or scaffolds or crawl at all. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and reach overhead with either of her upper extremities. She can frequently handle and finger and she must avoid exposure to extreme heat and cold, wetness, humidity, noise, vibrations, fumes, odors, dust, gases, poorly ventilated areas, and hazards, such as dangerous machinery and unprotected heights. She is also limited to simple, routine, repetitive tasks and instructions that do not involve more than occasional changes (and these changes must be gradually introduced). She cannot work at assembly-line pace. She can have frequent interactions with co-workers and only occasional interactions with the general public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on January 31, 1969 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (GED) and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability

because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 12- 21).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on January 16, 2019. On February 26, 2019 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on March 13, 2019. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to

the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that Step 5 was the determinative inquiry.

The following facts are relevant to the issues presented in this case. In 2009, Plaintiff was seen at the emergency room ("ER") on 10 occasions for multiple complaints. (*See* Tr. 768-79 (on 01/10/09 for cough and sore throat), Tr. 781-93 (on 03/11/09 for vaginal pressure and pain), Tr. 797-804 (on 04/06/09 for ear and sinus pain), Tr. 808-18 (on 05/23/09 for headache), Tr. 821-30 (on 06/05/09 for back pain), Tr. 833-41 (on 07/14/09 for neck pain), Tr. 844-54 (on 08/02/09 for headaches, weakness, dizziness, and swelling in her lower extremities), Tr. 862-70 (on 08/10/09 for dizziness and headache), Tr. 605-12 (on 08/30/09 for bilateral lower extremity swelling and shortness of breath), and Tr. 613-20 (on 11/30/09 for low back pain).)

In addition to these ER visits, throughout 2009, Plaintiff also sought treatment from Dr. Cara Connors at Family Physicians, Sevierville. (Tr. 646-57.) During these sessions, Dr. Connors diagnosed Plaintiff with (1) vertigo, (2) headache, (3) edema, (4) arthralgia, (5) anxiety, (6) depression, (7) asthma, and (8) bursitis of the hip, among other conditions. (*Id.*) Abnormalities were noted on exam (Tr. 648, 650, 653) and Dr. Connors often prescribed medication and referred Plaintiff for additional treatment or testing (Tr. 646-57).

On December 2, 2009, Plaintiff underwent a whole-body bone scan. (Tr. 878.) This demonstrated possible degenerative changes in the lumbar spine and other findings which

required additional consideration. (*Id.*)

A lumbar spine MRI taken on December 30, 2009 revealed mild grade 1 retrolisthesis of the L5 relative to the S1 (degenerative in nature), with associated posterior disc bulge, and post element degenerative changes resulting in bilateral neural foraminal narrowing. (Tr. 885.)

In 2010, Plaintiff was seen at the ER on eight occasions for multiple complaints. (*See* Tr. 720-25 (on 02/14/10 for respiratory complaints), Tr. 726-30 (on 02/16/10 for laryngitis), Tr. 731-34 (on 03/16/10 for a sore throat), Tr. 735-39 (on 04/14/10 for neck pain), Tr. 740-46 (on 05/10/10 for pain after a fall), Tr. 747-53 (on 07/06/10 for abdominal pain), Tr. 754-58 (on 09/17/10 for leg and hip pain), and Tr. 759-63 (on 10/18/10 for body pain).) During this time, Ms. Daugherty also continued her primary care treatment sessions with Dr. Connors. (Tr. 622-45.) In addition to Dr. Connor's previous diagnoses, Dr. Connor also diagnosed Plaintiff with (1) back pain, (2) obesity, (3) degenerative disc disease, (4) nausea, (5) insomnia, and (6) fibromyalgia, among other conditions. (*Id.*) Abnormalities were noted on exam (Tr. 626, 629, 632, 638, 641, 644,) and Dr. Connors continued Plaintiff's medication management and treatment referrals (Tr. 622-45).

Because of her continued complaints of back pain, on February 10, 2010, Plaintiff underwent a therapy evaluation. (Tr. 715-19.) She was very tender bilaterally to palpations in the low back area. (Tr. 717.) She had a positive straight leg raise test on the left. (*Id.*) She had reduced strength and increased pain upon testing. (Tr. 716.) Plaintiff's short- and long-term goals were assessed, and a treatment plan was prepared. (Tr. 718.) Unfortunately, Plaintiff was unable to maintain her appointments, and she was discharged after two "no shows." (Tr. 712-14.)

In late 2010, Plaintiff was seen at Grant Blackford Mental Health for her (1) major

depressive disorder, recurrent, severe without psychotic features, and (2) generalized anxiety disorder. (Tr. 990-97, 1013-15.) She had marked deficits in: worthlessness or guilt, fatigue, insomnia or hypersomnia, depressed mood, decreased concentration, and lack of interest. (Tr. 990.) She also had excessive anxiety and worry, difficult to control anxiety, restlessness, poor concentration, muscle tension, and irritability. (*Id*.) Part of her stressors were her inability to pay for treatment and inability to access healthcare resources. (Tr. 993.) She was assigned a Global Assessment of Functioning (GAF) score of 50, indicating serious symptoms or serious impairment in functioning. (Tr. 994.) A treatment plan was created to target Plaintiff's symptoms. (*Id*.) At her first session on November 30, 2010, Plaintiff did not have insurance and her providers were "limited as far as what kind of medication to put her on." (Tr. 997.) Plaintiff returned one month later, without any improvement. (Tr. 1013-15.)

In late 2010, and then throughout 2011, 2012, and 2013, Plaintiff sought treatment with Dr. Julie Utendorf at Family Practice Associates, LLP. (Tr. 1050-54, 1104-06.) During this time, Plaintiff was treated for (1) fibromyalgia, (2) depression with anxiety features, (3) right arm swelling and edema with carpal tunnel syndrome, (4) history of osteoporosis, (5) history of chronic obstructive pulmonary disease ("COPD"), (6) weight gain, (7) morbid obesity, (8) history of probable sleep apnea, (9) chronic pain, and (10) chronic depression, among other conditions. (Tr. 1050-54, 1104-06.) Examinations revealed abnormalities, including: (1) "exquisitely" (Tr. 1104, 1106) tender to touch (Tr. 1104, 1105, 1106); (2) swelling on the distal forearm and hands with abnormal sensation (Tr. 1105); (3) limited grip strength (Tr. 1105); (4) obesity (Tr. 1101, 1104, 1105, 1106); (5) peripheral trace edema (Tr. 1105, 1106); and, (6) limited range of motion (Tr. 1104). Plaintiff was prescribed medication management and provided referrals for additional

testing and treatment. (Tr. 1050-54, 1104-06.)

On January 20, 2011, at the request of the State Agency, Plaintiff presented herself for a consultative psychological examination with Ceola Berry, Ph.D., HSPP. (Tr. 1016-18.) On exam, Plaintiff's mood was dysthymic with congruent, weepy, affective expressions. (Tr.1017.) While she was cooperative, she had a subdued interpersonal energy and reported depressive periods as chronic and often debilitating. (*Id*.) Plaintiff's "energy level waned considerably throughout the examination with appearance of frozen tears." (Tr. 1018.) Dr. Berry diagnosed Plaintiff with major depressive disorder, recurrent, severe. (*Id*.) Dr. Berry assigned a GAF score of 59 (*id*.), indicating moderate symptoms or moderate impairment in functioning. Dr. Berry opined that Plaintiff's ability to work would be primarily affected by her perceived physical limitations and secondarily by mood states. (Tr. 1018.)

On January 25, 2011, at the request of the State Agency, Plaintiff presented herself for a consultative physical examination with Dr. Melanie Gatewood. (Tr. 1019-23.) Plaintiff's height was measured at 64 inches and she weighed 299 pounds. (Tr. 1020.) Dr. Gatewood noted that Plaintiff was "obese, very tearful, and in lots of pain during the exam." (*Id.*) On exam, Plaintiff was very painful to the touch due to presence of tender points. (Tr. 1021.) Her gait was slow; she did not have the ability to stand on heels or toes and she refused to attempt the toe-walk. (*Id*.) Although she did the heel-walk, it was poor, and she was very unbalanced and needed support to complete the tandem walk. (*Id*.) Plaintiff was unable to lie flat on her back on the exam table. (*Id*.) She got on and off the exam table slowly. (*Id*.) Motor strength was decreased 4/5 in the upper and lower extremities. (Tr. 1021.) Dr. Gatewood noted: "Clinical evidence does possibly support the need for an ambulatory aid…." (*Id*.) There was an abnormal, very achy

sensation in the upper and lower extremities. (*Id*.) She had a limited range of motion in her knees and hip exam could not be formally tested. (*Id*.) Dr. Gatewood diagnosed fibromyalgia, peripheral neuropathy, and multi-articular arthritis. (Tr. 1021-22.)

On January 27, 2011, a psychological consultant for the State Agency opined that Plaintiff's major depression and generalized anxiety disorder were severe impairments, but would not preclude the ability to perform simple tasks and superficial interactions with co-workers and supervisors. (Tr. 1024-40.) This assessment was affirmed by another State Agency psychological consultant. (Tr. 1056.)

On February 8, 2011, a medical consultant for the State Agency opined that Plaintiff's obesity and osteoarthritis were severe impairments, but that she could lift 20 pounds occasionally, 10 pounds frequently; stand/walk at least two hours in an 8-hour workday; and, sit for six hours in an 8-hour workday. (Tr. 1042-49.) This assessment was affirmed by another State Agency medical consultant. (Tr. 1055.)

In 2012, Plaintiff sought treatment at the Centers for Pain Relief, mostly with Sara Nevil, NP. (Tr. 1109-87.) Between August 2012 and December 2013, Plaintiff was seen on 15 occasions, during which time she was diagnosed with: (1) pain neck/cervicalgia, (2) cervical spondylosis/arthropathy, (3) cervical syndrome/occipital neuralgia, (4) spasm of muscle, (5) myalgia and myositis, (6) pain, thoracic, (7) pain in joint, (8) radiculopathy, lumbar/thoracic, (9) sacroiliitis, (10) pain, lumbar, (11) lumbar spondylosis/arthropathy, (12) Von Willebrand's Disease (i.e., a bleeding disorder), (13) chronic pain syndrome, (14) cervical dystonia (spasmodic torticollis), and (15) chronic daily headache, among other conditions. (*Id*.) Multiple examinations were performed during these visits. (*Id*.)

Abnormal findings from lumbar spine and lower extremity testing included: (1) pain (Tr. 1112, 1118, 1133); (2) tenderness (Tr. 1112, 1118, 1123, 1128, 1133, 1138, 1144, 1149, 1154, 1159, 1164, 1169, 1174, 1180, 1186); (3) positive straight leg raise (Tr. 1112, 1128, 1133, 1138, 1154, 1164, 1174, 1180, 1186); (4) abnormal torque bilaterally (Tr. 1112, 1118, 1123, 1128, 1133, 1138, 1144, 1149, 1154, 1159, 1164, 1169, 1174, 1180, 1186); (5) abnormal Patrick (or FABER) test (*i.e.*, a test helpful in detecting limited hip motion and distinguishing hip pain from sacroiliac disease) results bilaterally, largely with radicular symptoms present (Tr. 1112, 1118, 1123, 1128, 1133, 1138, 1144, 1149, 1154, 1159, 1164, 1169, 1174, 1180, 1186); and positive flip's test (*i.e.*, a test to determine nerve irritation related to the spine) bilaterally (Tr. 1118). Abnormal findings from cervical and thoracic testing included: (1) tenderness (Tr. 1112, 1118, 1123, 1133, 1138, 1144, 1149, 1154, 1159, 1164, 1174, 1180, 1185-86); limited range of motion (Tr. 1112, 1133, 1138, 1144, 1149, 1159, 1164, 1169, 1174, 1180, 1186); positive Spurling's test indicating radicular pain (Tr. 1123, 1133, 1180); and positive occipital Tinel's sign indicating nerve tingling (Tr. 1118, 1144, 1149, 1154, 1169, 1180, 1185-86). Cranial exams noted positive Tinel's sign or occipital tenderness. (Tr. 1118, 1180, 1185.) Plaintiff was often prescribed medication for her conditions. (Tr. 1109-87.) Additionally, she was prescribed a cane. (Tr. 1134.)

A polysomnography taken on August 23, 2013 demonstrated (1) moderate obstructive sleep apnea, (2) obesity hypoventilation syndrome, and (3) moderate periodic limb movement disorder with significant arousals. (Tr. 1067-68.) Plaintiff needed a CPAP (*i.e.*, Continuous Positive Airway Pressure used as a treatment for breathing problems such as sleep apnea) and clinical follow-up was strongly recommended. (*Id.*) Weight loss and other lifestyle measures were also recommended. (*Id.*)

On September 6, 2013, Plaintiff underwent another sleep study (Tr. 1062-64.) Testing noted that Plaintiff required Adaptive Servo Ventilation (ASV) titration (*i.e.*, a noninvasive ventilatory treatment option created specifically for the treatment of adults who have obstructive sleep apnea and central and/or complex sleep apnea). (Tr. 1064.) On this occasion, interventions were not able to correct her central sleep apnea. (*Id.*) Weight loss and other lifestyle measures were recommended. (*Id.*)

On April 18, 2014, Plaintiff was seen at the ER for back and muscle pain after climbing a few stairs. (Tr. 1234-35.) She had tenderness on exam. (Tr. 1235.) She was diagnosed with chronic back pain and fibromyalgia, given care instructions, and discharged home. (*Id.*)

On July 24, 2014, Plaintiff was seen at the ER for abdominal pain, radiating to her back. (Tr. 1193-97.) Plaintiff was admitted for inpatient treatment. (Tr. 1196.) She stayed for seven days. (Tr. 1203.) Discharge diagnoses from July 30, 2014 included acute pancreatitis with secondary diagnoses including hypertension, gastroesophageal reflux disease ("GERD"), degenerative disc disease, and fibromyalgia. (Tr. 1203.)

In October 2014, a medical consultant for the State Agency determined that Plaintiff's conditions were not severe; a psychological consultant determined that Plaintiff did not have a mental medically determinable impairment. (Tr. 82-83.)

Plaintiff was seen on two occasions at the ER in late 2014. (Tr. 1238-42, 1273-75.) On the first, she complained of a cough and pain, and testing demonstrated pneumonia in the left lung. (Tr. 1248.) She returned, with similar complaints, but testing showed no active disease. (Tr. 1275.) On both occasions, she was discharged the same day with medications. (Tr. 1242, 1275.)

Plaintiff continued to seek treatment with Dr. Utendorf throughout 2015. (Tr. 1370-

1423.) Dr. Utendorf saw Plaintiff on eight occasions that year for treatment of her (1) uncontrolled diabetes with associated autonomic neuropathy, (2) sinusitis, (3) fibromyalgia, (4) asthma, (5) anxiety, (6) depression (major recurrent), and (7) pain, among other conditions. (*Id.*) Examinations noted the following abnormalities: (1) slow gait (Tr. 1370); (2) tenderness to touch (Tr. 1370, 1377, 1391, 1396); (3) absent filaments in the feet (Tr. 1370, 1391, 1399); (4) diminished pulses in the feet (Tr. 1399); and, (5) obesity (Tr. 1382, 1390-91). Dr. Utendorf often prescribed medication management and referrals for treatment or testing. (Tr. 1370-1423.)

At the request of the State Agency, on February 22, 2015, Plaintiff presented herself for a consultative physical examination with Dr. H.M. Bacchus, Jr. (Tr. 1284.) On exam, Plaintiff had a flat affect and mildly depressed mood. (Tr. 1285.) Plaintiff had a slightly antalgic gait favoring the left lower extremity; she was unable to hop and had difficulty squatting. (*Id.*) She had tenderness to palpation and range of motion in the lumbosacral spine. (*Id.*) Range of motion was limited in her neck, lower back, shoulders, knees, hips, and ankles. (Tr. 1285, 1289.) She had positive trigger point tenderness across the upper back and posterior shoulders. (Tr. 1285.) She had reduced grip strength bilaterally. (*Id.*) Her fine and gross dexterity were slow. (*Id.*) An xray of the lumbar spine taken at this exam demonstrated multilevel degenerative changes in the lower lumbar spine. (Tr. 1287.)

Dr. Bacchus diagnosed Plaintiff with (1) fibromyalgia, (2) chronic lower back pain with lower extremity radiculopathy left greater than right, (3) non-insulin dependent diabetes mellitus, (4) depression/anxiety, (5) history of acute pancreatitis with NASH (i.e., nonalcoholic steatohepatitis) and early cirrhosis, (6) hypertension, (7) history of GERD, (8) hyperlipidemia, and (9) history of moderate obstructive sleep apnea. (Tr. 1286.) Dr. Bacchus opined that Plaintiff

12

appeared to have some generalized joint and muscle pain which caused a limitation in regard to prolonged standing and walking, repetitive bending, squatting, overhead reaching, climbing, and walking on uneven ground. (*Id.*)

At the request of the State Agency, on February 24, 2015, Plaintiff presented herself for a consultative psychological examination with Paula Neuman, Ed.D., Psy. D., HSPP. (Tr. 1291.) Dr. Neuman noted that Plaintiff's mood was very flat and that she was tearful throughout the examination. (Tr. 1294.) Dr. Neuman diagnosed (1) persistent depressive disorder with anxious distress, (2) fibromyalgia, (3) diabetes, (4) history of hysterectomy, and (5) degenerative disc and compressed spine. (Tr. 1296.)

Plaintiff was taken to the ER by ambulance on March 8, 2015 for an acute onset of the upper mid back pain. (Tr. 1306.) It had started, all of a sudden, while she was in bed lying down on her side and trying to turn over. (*Id.*) Examination noted tenderness in muscle spasm and right upper back area towards the right scapula with noticeable muscle spasm paravertebral muscle and vague tenderness in the dorsal spine. (Tr. 1308.) She was provided medication intravenously, which helped with the pain. (*Id.*) She was discharged home with pain medication and a muscle relaxer. (*Id.*)

A pulmonary function study taken on March 21, 2015 demonstrated that Plaintiff had mild obstruction and had a lung age (*i.e.*, the age that the test results would be normal) of 65.5 (Tr. 1300.) Plaintiff also underwent x-rays of the knees, which demonstrated degenerative changes. (Tr. 1303-04.)

Around this time, a medical consultant for the State Agency determined that Plaintiff's fibromyalgia, obesity, and major joint dysfunction were severe impairments. (Tr. 92.) This

consultant opined that Plaintiff could lift 10 pounds frequently, stand and/or walk for two hours, and sit for six hours in an 8-hour workday, with additional postural and manipulative limitations. (Tr. 94-96.) A psychological consultant opined that Plaintiff's affective and anxiety disorders were not severe impairments. (Tr. 106-07.) These assessments were affirmed by other medical and psychological consultants. (Tr. 121-26.)

On May 6, 2015, Plaintiff presented herself for treatment at the Otis Bowen Center. (Tr. 1323-33.) A consult was recommended. (Tr. 1333.) On June 30, 2015, Plaintiff underwent an initial psychiatric evaluation for her long-standing depression and anxiety. (Tr. 1317-22.) On exam, her judgment, insight, and intellect and concentration were assessed as fair. (Tr. 1320.) Her mood was reported being down, anxious, and labile. (Tr. 1319.) She demonstrated some psychomotor agitation. (*Id*.) Primary diagnoses included (1) major depressive disorder, recurrent, and (2) panic attacks, rule out panic disorder and mood disorder secondary to general medical condition. (Tr. 1320.) She was assigned a GAF score of 60, indicating moderate symptoms or moderate difficulty in functioning. (Tr. 1321.) She returned to the center and underwent both individual therapy and medication management sessions. Between 2015 and the end of 2016, Plaintiff had 23 individual therapy sessions (Tr. 1462-1523) and seven medication management sessions (Tr. 1527-62). Her judgment and insight at these medication management sessions were assessed as "fair." (Tr. 1530, 1536, 1541, 1546, 1551, 1556, 1561.)

On June 15, 2015, Dr. Utendorf wrote a 'To Whom It May Concern ' letter noting that Plaintiff had been her patient and that Plaintiff had chronic issues with fibromyalgia, anxiety, depression, and morbid obesity. (Tr. 1336.) Dr. Utendorf opined that Plaintiff has a "level of health concerns to consider her for disability." (*Id.*)

At Dr. Utendorf's request, on July 13, 2015, Plaintiff underwent a functional capacity evaluation with Bobe Frigo, OTR, CHT. (Tr. 1338-53.) Mr. Frigo opined that Plaintiff "demonstrates less than sedentary capacities with non-material and material handling capacities." (Tr. 1338.) Mr. Frigo noted a correlation between Plaintiff's anxiety and her ability to perform on testing. (*Id*.)

On September 29, 2015, Plaintiff was seen in the ER complaining of a two-day migraine headache. (Tr. 1564-67.) She was treated and discharged that same day. (*Id*.)

In 2016, Plaintiff sought continued treatment with Dr. Utendorf. (Tr. 1424-50.) She was seen on five occasions this year. (*Id*.) Examinations noted abnormalities, including: (1) obesity (Tr. 1426, 1431, 1446); (2) appears older than stated age (Tr. 1434); (3) abnormal filament test at the toes (Tr. 1435); and (4) tenderness (Tr. 1446). Plaintiff continued with medication management and referrals for testing and treatment. (Tr. 1424-50.)

On March 8, 2016, Plaintiff saw Jessica Escobar, NP, at PPG Endocrinology for a consultation of her uncontrolled diabetes. (Tr. 1657-65.) After an exam, Ms. Escobar provided medication management. (Tr. 1664.) Ms. Escobar noted that Plaintiff's finances were an issue. (*Id.*) Ms. Escobar recommended that Plaintiff lose weight and that she should focus on lifestyle changes. (*Id*.) Plaintiff returned on June 10, 2016 (Tr. 1678-84) and September 16, 2016 (Tr. 1698-1705), and both times Ms. Escobar noted that Plaintiff's uncontrolled diabetes involved neuropathy (*id*.). Ms. Escobar also noted that Plaintiff's fibromyalgia and stress were affecting her diabetes and weight. (Tr. 1704.)

On March 9, 2016, Plaintiff was seen at the ER for back spasms. (Tr. 1579-83.) Examination noted reproducible tenderness to palpation of the bilateral thoracic paraspinal

musculature with no midline cervical, thoracic, or lumbar tenderness to palpation. (Tr. 1582.) She was treated and discharged that same day. (*Id.*)

A pulmonary function study taken on April 20, 2016 showed mild obstructive lung defect. (Tr. 1646.)

On May 2, 2016, Plaintiff returned to the ER, complaining of back pain. (Tr. 1592.) Examination demonstrated tenderness in the paravertebral muscles and thoracic spine area and towards the left side, as well as tenderness to palpation when she tried to bend towards the right. (Tr. 1595.) She was given prescriptions and discharged home that day. (*Id.*)

Plaintiff again returned to the ER on June 28, 2016 for an exacerbation of her back pain after leaning over to pick something up and suddenly felt a muscle in her back pull. (Tr. 1597-1601.) She was given prescriptions and discharged home that day. (Tr. 1601.)

On June 10, 2016, Ms. Escobar wrote a "To Whom It May Concern" letter noting that Plaintiff was under her care for her uncontrolled diabetes with complications. (Tr. 1355.)

On July 16, 2016, Plaintiff was seen in the ER, complaining of leg pain. (Tr. 1603.) Examination noted swelling in the right knee with tenderness. (Tr. 1606.) She was given prescriptions and a knee immobilizer, and discharged home that day. (*Id.*)

On September 30, 2016, Dr. Utendorf wrote a "To Whom It May Concern" letter noting that Plaintiff has chronic, non-specific pain syndrome with myalgia, most closely resembling fibromyalgia. (Tr. 1357.) Dr. Utendorf opined that Plaintiff's disability stems from anxiety and depression, for which she obtains treatment. (*Id.*)

On October 14, 2016, Plaintiff was seen at the ER for vaginal pain. (Tr. 1609-14.) She was having difficulty with establishing care with a pain management center. (Tr. 1613.) Because

her pain was deemed "legitimate," Plaintiff was provided pain medication and discharged home. (*Id*.) She returned one week later for similar pain. (Tr. 1361-63.) Examination was too painful to undergo. (Tr. 1363.) She was discharged that day with pain prescriptions. (*Id*.)

On December 8, 2016, Plaintiff was seen at the ER, complaining of leg pain after falling down stairs. (Tr. 1622.) Examination showed diffuse tenderness to the patella extending into the medial and lateral joint line; diffuse tenderness without massive effusion noted; anterior and posterior drawer testing shows stability with significant pain which limits exam; and, significant pain from the mid-thigh into the knee with any type of movement of the leg. (Tr. 1625-26.) She was diagnosed with small effusion, very mild degenerative joint disease, and provided medication, both oral and intramuscular. (Tr. 1626.) She was given a knee immobilizer and crutches as well and discharged with instructions to see an orthopedist. (Tr. 1627.)

On December 12, 2016, Plaintiff began pain management treatment at the PPG Pain Management Clinic. (Tr. 1740-46.) Exam was positive for pain with forward flexion of the back. (Tr. 1745.) Straight leg raising in sitting and supine position were positive. (*Id*.) She had left knee tenderness. (*Id*.) Her gait was antalgic. (*Id*.) She was diagnosed with (1) fibromyalgia, (2) chronic pain syndrome, (3) BMI 50.0-59.9, and (4) diabetic neuropathy, painful, among others. (Tr. 1745.) She was given medication and referrals for additional treatment and testing. (Tr. 1745-46.)

Plaintiff testified that she had recently gained "quite a bit of weight," she thought, because of her medications. (Tr. 38.) She does not drive because of her anxiety and panic attacks. (Tr. 38-39.) Further, she does not drive because she cannot feel the pedals beneath her feet due to the neuropathy and cannot sit in one position for long. (Tr. 39.) Plaintiff has two friends and lives with her oldest daughter and her family. (Tr. 48.) She described it as a "very strained household."

(*Id.*) She believed that her kids look at her as a burden, as someone they have to take care of. (Tr. 49.)

Plaintiff testified that she stopped working because she was having breakdowns and could not function. (Tr. 39.) It would happen when things got busy or when she was under stress. (*Id.*) She reported that she saw a counselor once every two weeks, but would see them more often if she was in a dark period. (Tr. 47.) She also takes medications. (*Id.*) Sometimes she needs more medications if she is going through a stressful time. (Tr. 48.)

Plaintiff testified that she cannot work because she gets overwhelmed with the stress of having to communicate with people. (Tr. 45.) She cannot stand or sit for long periods. (*Id.*) She cannot work because there are days where she cannot get out of bed. (*Id.*) Some days, her pain is all over and she can only get up to go to the restroom on those days. (*Id.*) This happens two to three times a week. (Tr. 46.)

She testified that a typical day will vary, but that her pain is worse in the evenings. (Tr. 49.) She has pain during the day and it just gets worse as the day goes on. (*Id.*) She sees doctors and takes pain medication. (Tr. 50.) She has a walking stick that her brother-in-law made for her, which she uses if she is walking. (Tr. 51.) She needs to sit down and take breaks when she walks. (Tr. 52.) She can sit for maybe 30 to 45 minutes and then will need to get up or lie down or walk around a bit. (*Id.*) She testified that standing is harder for her than walking. (*Id.*) At the house, she can care for her little dog. (Tr. 53.) She can prepare simple, small meals. (*Id.*) She can carry a five pound bag. (Tr. 55.) Other than that, she has trouble. (Tr. 53.) Doing activities causes a lot of pain, and when she starts hurting, she starts to have anxiety and panics, and this creates a downward spiral. (*Id.*) She has trouble bending. (*Id.*) She has neuropathy in her feet, which are

completely numb. (Tr. 58.) This affects her balance and she has difficulty with stairs. (Tr. 59-60.) The numbness also happens to her hands too. (Tr. 58.) She drops items (e.g., dinner plate, bottle, brush). (Tr. 61.) She also has trouble using her fingers. (*Id.*) Her abilities diminish as the day goes on. (Tr. 62.) She cannot reach. (Tr. 63.) She has trouble sleeping, because of pain and her panic. (Tr. 54.)

Generally, she only leaves the house to go to the doctor. (Tr. 54.) If she has a good day, she might try shopping. (*Id.*) She testified that she has two good days in a week. (*Id.*) But she has trouble being around people, regardless of the size of the group. (Tr. 55-56.) She gets overwhelmed if there is more than one person. (Tr. 56.) She has panic attacks two to three times a week. (Tr. 57.) She will need complete silence and isolation. (*Id.*) Noise bothers her all the time. (*Id.*)

The VE identified Plaintiff's past work as found in the Dictionary of Occupational Titles ("DOT"). (Tr. 65.) The ALJ asked the VE to assume a hypothetical individual ultimately consistent with the ALJ's final residual functional capacity. (Tr. 65-67.) The VE testified that the individual could perform Mail Sorter (DOT No. 239.687- 014), Call Out Operator (DOT No. 237.367-014), and Eye Glass Frames Polisher (DOT No. 713.684-038). (*Id.*) The VE testified that if the individual needed a walking stick, there would be no jobs available. (Tr. 67.) The VE testified that an individual off task more than 5% would be unable to sustain work. (*Id.*) The VE testified that an individual could not miss more than one day per month. (Tr. 68.)

The ALJ found that Plaintiff's (1) fibromyalgia, (2) morbid obesity, (3) diabetic neuropathy, (4) obstructive sleep apnea, (5) arthritis in the knees and feet/ankles, (6) disorders of the spine, (7) anxiety/panic disorder, and (8) depression were severe impairments (Step 2). (Tr.

13.) The ALJ found that Plaintiff's conditions neither met nor equaled a listing in the Listing of Impairments (Step 3). (Tr. 14.) The ALJ found that Plaintiff had the residual functional capacity ("RFC") for sedentary work, with the limitations specified above. (Tr. 16.) The ALJ found that Plaintiff could not perform any of her past work (Step 4), but concluded that other work existed in the economy (Step 5). (Tr. 20-21.)

In support of remand, Plaintiff alleges nine separate reversible errors which she claims manifests from two critical defects in the ALJ's decision: cherry picked evidence and failure to provide an accurate and logical bridge supporting the ALJ's conclusions and assertions.

First, Plaintiff argues that the ALJ erred at Step 2 in failing to consider the combination of Plaintiff's impairments. Step Two is the foundation of the ALJ's Decision. It is the first inquiry an ALJ makes of a claimant's conditions. 20 C.F.R. § 404.1520. If the evidence is not properly analyzed at Step Two, it will have negative ramifications throughout the remainder of the Decision. *O'Connor- Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016) (erroneously eliminating depression at Step Two resulted in a flawed ultimate decision). In this case, while the ALJ concluded that Plaintiff suffered from severe impairments, Plaintiff contends that the ALJ failed to consider the severity of other medically determinable impairments that affect Plaintiff's functioning.

For example, the ALJ concluded that Plaintiff's migraines were not a severe impairment, because she was seen at the ER only a couple of times. (Tr. 14.) Likewise, the ALJ concluded that Plaintiff's breathing problems were not supported because she was never hospitalized for it and "only rarely exhibited decreased breath sounds or abnormal lung sounds." (*Id.*) Plaintiff argues that neither of these conclusions are supported by substantial evidence.

Plaintiff contends that, the ALJ did not consider these conditions as they may relate to Plaintiff's other conditions. The regulations specifically note that concurrent impairments or the combined effect of impairments must also be considered. 20 C.F.R. § 404.1523(b) ("If you have two or more concurrent impairments which, when considered in combination, are severe, we must also determine whether the combined effect of your impairments."); 20 C.F.R. § 404.1523(c) ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."). Here, the ALJ summarily dismissed both Plaintiff's migraines and breathing problems as not severe because they alone did not establish severity. Agency regulations require remand under these circumstances. *Berset v. Astrue*, No. 5:11-CV-194-BG ECF, 2012 WL 3578597 *6 (N.D. Tex. 2012) ("Even if the ALJ were correct regarding the duration of Berset's lymphoma, his finding regarding lymphoma alone does not preclude Berset from satisfying the duration requirement. When a claimant has two or more impairments that are severe in combination, an ALJ "must also determine whether the combined effect of [the] impairments can be expected to continue to be severe for 12 months." 20 C.F.R. § 404.1522(b).").

Moreover, the ALJ failed to consider what effect these impairments might have on Plaintiff's other conditions. As explained by the Agency:

> Although an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities, the possibility of several such impairments combining to produce a severe impairment must be considered. Under 20 CFR, sections 404.1523 and 416.923, when assessing the severity of whatever impairments an individual may have, the

> adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment existed alone.

SSR 85-28, 1985 WL 56856 (Jan. 1, 1985). Here, the ALJ's sole focus was that the evidence did not individually establish the existence of a severe impairment. The ALJ failed to consider how Plaintiff's migraines and breathing problems would be severe if considered with her other severe impairments, including: fibromyalgia, morbid obesity, diabetes, diabetic neuropathy, obstructive sleep apnea, disorder of the back, anxiety/panic disorder, and depression. This is critical given the evidence showing that Plaintiff's conditions relate to each other. Axis III diagnoses are used "for reporting current general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder." DSM-IV-TR at 29. On multiple occasions, Plaintiff was diagnosed with medical conditions on Axis III. (See e.g., 1014, 1018, 1321.) Additionally, Ms. Escobar, one of Plaintiff's medical providers, opined as to interrelatedness of Plaintiff's conditions. (Tr. 1704.) Thus, the ALJ's analysis is critically flawed by failing to consider Plaintiff's migraines and breathing problems as they relate to her severe impairments.

The Commissioner does not defend these errors. Nor does the Commissioner demonstrate that the ALJ's focus on hospitalizations was supported. The Commissioner cites to no authority to suggest that hospitalizations are the driving factor when evaluating these conditions. Some courts have found that the mere lack of "more" ER visits is not sufficient to dismiss this evidence, particularly with regards to migraines. *Sech v. Comm'r of Soc. Sec.*, No. 7:13-cv-1356 (GLS), 2015 WL 1447125, at *3 (N.D.N.Y. Mar. 30, 2015). Indeed, "[b]ecause there is no test for migraine headaches" the Agency cannot rely on the lack of absence of objective evidence as a basis. *Federman v. Chater*, No. 95 Civ. 2892, 1996 WL 107291, at *2 (S.D.N.Y. Mar. 11, 1996)

(internal quotation marks and citations omitted); *Groff v. Comm'r of Soc. Sec.*, No. 7:05–CV–54, 2008 WL 4104689, at *6–8 (N.D.N.Y. Sept. 3, 2008) (the ALJ erred in placing emphasis on the absence of evidence). Thus, the ALJ erred in dismissing Plaintiff's migraines because the record lacked "more" ER visits.

Moreover, the ALJ's error at Step Two is further compounded by her failure to consider how Plaintiff's conditions interact with her other impairments. This is violation of multiple Agency regulations and rulings. Additionally, the Seventh Circuit requires that an ALJ must consider an applicant's "problems in combination." *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014). The Commissioner focuses on mere boilerplate references in the ALJ's Decision. This, however, does not provide the required accurate and logical bridge. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) ("We require that an ALJ build an 'accurate and logical bridge from the evidence to [his] conclusion'.") This legal error is emphasized by the facts in this case documenting the interrelatedness of Plaintiff's conditions.

The Commissioner asserts that the Step Two errors are harmless because the ALJ proceeded with the sequential evaluation. This is unavailing for at least three key reasons. First, an ALJ's failure to properly consider evidence at Step Two renders the entire Decision unsupported.. Second, the ALJ's error at Step Two is not salvaged by other stages of the ALJ's Decision because her subsequent findings are themselves unsupported. The Commissioner's reliance on *Henke v. Astrue* is misplaced. In *Henke*, the ALJ ultimately considered all of Plaintiff's impairments. 498 Fed.Appx. 636, 640 (7th Cir. 2012). Here, however, the ALJ made multiple additional errors at Step Three and in the RFC. Moreover, in *Henke*, the ALJ's RFC was "more generous" to the plaintiff. 498 Fed.Appx. at 641. That was not the case here (*i.e.*, the ALJ

failed to consider and include restrictions related to Plaintiff's cane use, and erred in translating moderate limitations into "simple, routine, repetitive tasks", etc.). Finally, the Commissioner's attempt to isolate the Step Two defects does little to cure the ALJ's error. The Seventh Circuit has noted that failure to properly consider evidence at a relevant step "does not provide much assurance" that the ALJ properly considered the evidence thereafter. Clearly, the ALJ's errors at Step Two warrant remand to address the individual errors and those that flowed thereafter. *Myles,* 582 F.3d at 678 (cumulative effect of multiple errors warranted remand).

Next, Plaintiff argues that the ALJ's Step 3 findings are not supported. Step Three, which requires close evaluation given its dispositive nature, see 20 C.F.R. §404.1520(a)(4), requires two independent conclusions—*i.e.*, whether a claimant's conditions, in combination, (1) meet and/or (2) equal a listed impairment. *See* 20 C.F.R. §§ 404.1520, 404.1525, 404.1526. Plaintiff argues that the ALJ erred in her analysis of both the physical and psychological aspects of the Step Three analysis and thus failed to support her determination with substantial evidence.

Plaintiff specifically argues that the ALJ erred in concluding that Plaintiff's cane was not prescribed by a medical source. Also, the ALJ does not identify which listing she considered regarding Plaintiff's back disorders. This leaves this Court no alternative but to speculate as to which listing the ALJ considered. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (explaining that in reviewing Step Three determinations, an ALJ should mention by name the specific listings he is considering; his failure to do so, if combined with a "perfunctory analysis," requires remand.) Without identifying the specific Listing that she considered, the ALJ's Decision cannot be supported by substantial evidence.

Further, even if the ALJ considered every single listing in Listing 1.00 — Musculoskeletal

System, the ALJ still reversibly erred in her analysis. Specifically, the ALJ concludes that Plaintiff does not meet or equal because "her cane/walking stick does not appear to have been prescribed by a medical source." (Tr. 14.) The ALJ's conclusion is incorrect. Foremost, Plaintiff was prescribed a cane. (Tr. 1134.) She was prescribed a cane on April 25, 2013 at a treatment session with Ms. Nevil at Centers for Pain Relief. (*Id.*) Further, there is evidence of record that supports the need for this cane. Specifically, Dr. Gatewood, who performed a consultative physical examination, opined that clinical evidence did possibly support the need for an ambulatory aid. (Tr. 1021.) Moreover, this assessment is supported by the objective abnormalities demonstrated on exam related to Plaintiff's ambulation and sensory deficits in her feet. (See e.g., Tr. 1021, 1285, 1370, 1391, 1399, 1435, 1745.) Thus, the ALJ's conclusion is factually incorrect. The ALJ's Step Three determination is based on an improper review of the evidence and thus cannot serve as substantial evidence at Step Three. Remand is necessary for this independently reversible error.

Moreover, this erroneous analysis infected Step Three, and the remaining steps that flowed from it. *Ribaudo,* 458 F.3d at 584 (remanding for "more thorough analysis" of Step 3 because the ALJ's failure "to evaluate any of the evidence that potentially supported Ribaudo's claim does not provide much assurance that he adequately considered Ribaudo's case."); *see also Cook v. Heckler*, 783 F.2d 1168, 1174 (4th Cir. 1986) (erroneous findings at Step Two usually infect the entire decision, since all of a claimant's impairments must be considered in combination at Steps Three, Four and Five). As discussed below, Plaintiff's use of a cane would impact her ability to perform work-related activities, and thus Step Five. As Plaintiff's cane was not properly considered at Step Three, remand is necessary for the harm this individual error

caused in the remainder of the Decision.

Like *Ribaudo*, in this case the Commissioner concedes that "the ALJ did not specifically cite" to the listing she considered. Thus, the ALJ's failure warrants remand. Alternatively, the Commissioner asserts that the listing is "readily apparent." However, this is based on speculation. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 125 (7th Cir. 2000) (speculation is not substantial evidence). The ALJ's failure to identify the listing she considered, leaves this Court no alternative but to speculate. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (a reviewing court should not be left to speculate). Further, as in *Ribaudo*, the ALJ did not provide a sufficient analysis for her finding that Plaintiff's conditions did not meet or equal a listed impairment. Thus, remand is warranted.

Contrary to the ALJ's finding, Plaintiff was prescribed a cane by her medical provider on April 25, 2013. (Tr. 1134.) The Commissioner asserts that the ALJ's error was harmless because Plaintiff did not fill the prescription. (Tr. 1292.) This defense fails. First, as the Seventh Circuit has noted, "[a] cane does not require a prescription." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). Second, the Commissioner focuses on one aspect of a report but ignores the other notation on that same report indicating that while Plaintiff did not purchase a cane from the pharmacy, she has a "walking stick." And, seemingly ignored by the Commissioner and the ALJ, is the effect that Plaintiff's limited finances had on her treatment and might have had on her ability to purchase a cane. (Pl. Br. at 36-39.) In fact, her walking stick was made at home by her family. Thus, the Commissioner's attempt to dismiss this evidence is unsupported.

As Plaintiff points out, a cane need not be required every day. *Grube v. Colvin*. In fact, the Commissioner seemingly acknowledges as much in her citation to SSR 96-9p. SSR 96-9p

explains that a cane may be "medically required" based on periodic use, or certain situations, and not necessarily all the time. Thus, the Commissioner's sole defense — that it was not used all the time — cannot cure the ALJ's omission and error. And in any event, this was not the basis the ALJ used to dismiss the evidence. *Sec. & Exch. Comm'n v. Chenery*, 318 U.S. 80, 93-94 (1934) (forbidding an agency's lawyers from defending the agency's decision on grounds that the agency itself had not embraced). Thus, it cannot serve as a defense herein.

Obviously, Plaintiff's use of a cane was not properly considered. Remand is necessary for this error and the harm it caused in the remainder of the Decision. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) ("the ALJ's opinion is silent as to this critical piece of evidence, despite the ALJ's duty to acknowledge potentially dispositive evidence.").

At Step Three, the ALJ also considered Plaintiff's mental functioning under the "B Criteria." However, the ALJ critically erred in this regard. Concerning Plaintiff's mental functioning, the ALJ determined that Plaintiff had moderate limitations in (1) understanding, remembering, or applying information, (2) interacting with others, and (3) concentrating, persisting, or maintaining pace; the ALJ determined that Plaintiff had only mild limitations in adapting or managing herself. (Tr. 15.) The ALJ's sole support for this determination was her assessment of Plaintiff's daily activities:

> the claimant stays in contact with her adult children and has friends, that she separated from her husband in May 2010, that she no longer drives, and that she is able to remind her daughter to give food and water to their pets, take her medications with some reminders, count change, use a phone, play cards and board games, wash dishes, "play" on a computer, prepare simple meals (although she reportedly sits down while doing so), read for pleasure, do some shopping, color in an adult coloring book, and watch television (Ex. B-5E, B-6E, B-l0E, B-1 1 E, B-20E, B-21E, B- 26E, B-27E, claimant's testimony).

(Tr. 15.) Plaintiff contends that this is an insufficient justification for the ALJ's "B Criteria" findings under well-settled judicial precedent. First, the Seventh Circuit has held that an ALJ may not consider daily activities, without looking at the qualifications inherent in those activities. *Thompson v. Berryhill*, 722 F. App'x 573, 582 (7th Cir. 2018); *Punzio*, 630 F.3d at 710; *Larson*, 615 F.3d at 751. In this case, while Plaintiff performs some daily activities, she cannot do so without difficulty or assistance. Plaintiff's qualifications are best detailed in the multiple Function Reports in the record, which show that her activities are not performed independently, appropriately, or on a sustained basis. (*See e.g.*, Tr. 376-83, 386-93, 418-25, 426-33, 489-96, 543-50).

For example, while Plaintiff stays in contact with her daughter, Plaintiff gets overwhelmed with the stress of having to communicate with people. (Tr. 45.) She has trouble being around people, regardless of the size of the group. (Tr. 55-56.) She gets overwhelmed if there is more than one person. (Tr. 56.) Likewise, while Plaintiff can go shopping, she can only shop on good days. (Tr. 38-39.) She has more bad days than good days in a week. (*Id*.) And, although the ALJ stated that she can prepare simple meals, the record shows that this is merely "cold meat sandwiches [and] frozen dinners in the microwave" — otherwise, she requires help or needs her family to make her meals. (Tr. 378; *see also* Tr. 378, 388, 428.) Similarly, while Plaintiff may read or watch television or do other activities, "she jumps from one thing to another frequently." (Tr. 493.) This is due to her conditions and inability to remain on task. (Tr. 547, 555.) Further, these activities are only done when she is having good days. (Tr. 501.) She has more bad days than good days in a week. (Tr. 38-39.) The above are all qualifications, which the ALJ did not consider. Thus, the ALJ's assessment of Plaintiff's daily activities as definitive

evidence for her "B Criteria" assessment is not supported.

Second, the ALJ's analysis does not take into account any of the objective evidence of record regarding Plaintiff's mental functioning. This evidence would warrant a more restrictive "B Criteria." For example, the ALJ never considered the documented clinical abnormalities. (*See* Tr. 990 (noting that Plaintiff had marked deficits in: worthlessness or guilt, fatigue, insomnia or hypersomnia, depressed mood, decreased concentration, and lack of interest; she had excessive anxiety and worry, difficult to control anxiety, restlessness, poor concentration, muscle tension, and irritability); Tr. 1017-18 (noting that Plaintiff's mood was dysthymic with congruent, weepy, affective expressions; she had subdued interpersonal energy; her "energy level waned considerably throughout the examination with appearance of frozen tears."); Tr. 1530, 1536, 1541, 1546, 1551, 1556, 1561 (Plaintiff's judgment and insight were assessed as merely "fair"); Tr. 1319 (she demonstrated psychomotor agitation); Tr. 1320 (her judgment, insight, and intellect and concentration were assessed as merely being fair); Tr. 1294 (her mood was very flat and she was tearful throughout examination); Tr. 1285 (she had a flat affect and mildly depressed mood).) The ALJ's failure to consider any of this objective evidence renders her "B Criteria" assessment unsupported.

Third, the ALJ did not consider Plaintiff's multiple treatment management. The record denotes treatment as early as 2009. (Tr. 647 (noting Anxiety State and Depressive Disorder as active medical history and problems).) As early as 2009, Plaintiff was receiving medication management for these conditions. Plaintiff's treatment continued for the next seven years. During this time, she frequently received treatment for her mental conditions and required adjustments to her management. (*Id.*) This longstanding treatment history, which was not considered by the ALJ,

renders her "B Criteria" assessment unsupported.

Moreover, the ALJ erred because she did not consider, or account for, Plaintiff's physical conditions in the "B Criteria" analysis. This is particularly critical given the interrelatedness of Plaintiff's conditions, made evident by Plaintiff's Axis III diagnoses. Axis III diagnoses are used "for reporting current general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder." DSM-IV-TR at 29. In this case, on multiple occasions, Plaintiff was diagnosed with medical conditions on Axis III. (See, e.g., 1014, 1018, 1321.) Moreover, Ms. Escobar, one of Plaintiff's providers, opined as to interrelatedness of Plaintiff's conditions as well. (Tr. 1704.) Thus, Plaintiff's physical conditions are related to and impact her mental functioning. Thus, the ALJ's failure to consider this evidence renders her "B Criteria" assessment unsupported.

Thus, a review of the evidence as demonstrated herein, shows that the ALJ's assessment of the "B Criteria" is unsupported. Given the facts in this case, the ALJ's selective assessment of Plaintiff's daily functioning cannot serve as substantial evidence. As this was the only basis the ALJ used to make her "B Criteria" assessment, remand is warranted. The ALJ failed to view the evidence relevant to the "B Criteria" analysis in a holistic and fair fashion at Step Three, which ultimately infected the RFC and the remainder of the Decision. (*See* Tr. 16 ("the following [RFC] reflects the degree of limitation the undersigned has found in the 'paragraph B' mental functional analysis.")). Thus, there is no substantial support for the ALJ's Decision. *See Ribaudo*, 458 F.3d at 584; *Cook*, 783 F.2d at 1174.

Relying solely on *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004), the Commissioner asserts that any error in the ALJ's Step Three analysis is harmless because other aspects of the

Decision (*i.e.*, the ALJ's RFC analysis), when read as a whole, provide substantial support for the Step Three conclusions. This defense fails. At the outset, Plaintiff notes that in alleging harmless error, the Commissioner ignores a critical aspect of Step Three of the Agency's five-step analysis — Step Three determinations may be dispositive. *See* 20 C.F.R. § 404.1520(a)(4). Here, given the evidence regarding Plaintiff's impairments and their combined effect, the ALJ's discussion of medical equivalence is wholly insufficient. Thus, the Commissioner's harmless error suggestion is inappropriate in the Step Three context, given the critical and dispositive nature of a Step Three determination.

While Plaintiff agrees that ALJ decisions should generally be read as a whole, this general principle of construction cannot render the ALJ's critical Step Three error "harmless" for at least three reasons. First, the Commissioner's reliance on the remainder of the Decision to cure the errors erroneously presupposes that the rest of Decision is correct — that is, that the ALJ made no other errors. However, the other aspects of the ALJ's Decision are unsupported and, thus, cannot salvage the ALJ's Step Three. *Reece v. Colvin*, 1:13-cv-1063 -SEBMJD, 2014 WL 4722534, *4 (S.D. Ind. Sept. 22, 2014). Second, the Commissioner's reliance on *Rice* is misplaced. In *Rice*, the Seventh Circuit, in a footnote, noted that it would consider the ALJ's treatment of the record evidence in support of both her conclusion at Steps Three and Five (that is, the RFC) "because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five." *Id*. at 370, n.5. However, *Rice* is inapplicable here because, in this case, the evidentiary analysis at Step Three, while overlapping, is entirely different from the assessment of the RFC. (Compare 20 C.F.R. § Pt. 404, Subpt. P., App. 1, Section 12.00(E) requiring consideration of four areas of functioning with SSR 96-8p requiring consideration of "all" the

evidence in combination to address specific work-related limitations.) Third, the Commissioner's reliance on *Rice* is outdated in light of subsequent precedent. *Craft*, issued four years after *Rice's* footnote, holds that the "RFC analysis is not a substitute" for errors in earlier stages of the ALJ's Decision, "even though some of the evidence considered may overlap." *Craft*, 539 F.3d at 675. Thus, the Commissioner's reliance on *Rice* is misplaced.

In her Response, the Commissioner focuses on the evidence the ALJ did consider. However, this does not address the true issue. First, the daily activities the ALJ "considered" are in no way an accurate view of the evidence as required by the Seventh Circuit. The Commissioner's focus on the ALJ's identification of Plaintiff's daily activities fails in light of the facts. This is bolstered by the regulations requiring that the ALJ consider the degrees, not the absolutes of activities. *See* 20 C.F.R. § Pt. 404, Subpt. P., App. 1, § 12.00(F)(1) ("We will consider, for example, the kind, degree, and frequency of difficulty you would have"); *Id*. at § 12.00(F)(3)(d) (the Agency will look to see how independently, appropriately, effectively, the activity is done and whether it is performed on a sustained basis). Thus, the ALJ's focus, and the Commissioner's restatement of the activity, without the proper context, violates Seventh Circuit precedent and the Agency's own regulations.

Moreover, the ALJ's discussion of Plaintiff's daily activities does not, in any way, address the other evidence the ALJ failed to consider (i.e., objective findings, treatment management, and Plaintiff's physical conditions), which would warrant greater limitations in the "B Criteria". The Commissioner suggests that Plaintiff's Axis III diagnoses does not document the mental functional limitations as set forth in the "B Criteria" and, thus, did not need to be considered by the ALJ. This is unsupported and contrary to the Agency's regulations. Specifically, physical

symptoms and the results of physical examinations, along with medical (as opposed to psychiatric and psychological) are all relevant to the mental Listings analysis. *See* 20 C.F.R. § Pt. 404, Subpt. P., App. 1, § 12.00(B)(5)(a), 12.00(B)(6)(a), 12.00(C)(2).

Clearly, a review of the evidence shows that the ALJ's assessment of the "B Criteria" is unsupported. The Commissioner fails to justify the ALJ's error. Thus, remand is necessary.

Next, Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because it fails to accommodate all of Plaintiff's physical limitations, fails to define the sit-stand option under agency regulations and fails to address Plaintiff's ambulatory aid. Generally, the RFC is a determination of the most a claimant can do despite their limitations. 20 C.F.R. § 404.1545(a)(1). It is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence. *See* SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545(a)(3).

At the outset, Plaintiff points out that the opinion from the State Agency medical consultants cannot salvage the ALJ's errors as they, themselves, were critically out of date by the time the ALJ issued the Decision. *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018); *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Thomas v. Colvin*, 826 F.3d 953 (7th Cir. 2016); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). In this case, the out-of-date State Agency opinions fail to consider a multitude of subsequent objective abnormal findings in the record. For example, the State Agency opinions do

not account for the multiple abnormalities present in the Center for Pain Relief sessions. Between August 2012 and December 2013, Plaintiff was seen on 15 occasions and a myriad of abnormal findings were noted. (Tr. 1109-87.) Critically, it was her providers at the Center for Pain Relief who prescribed Plaintiff a cane. (Tr. 1134.) Plaintiff argues that the State Agency's failure to consider this critical evidence warrants remand, akin to the Seventh Circuit's remand in *Moreno*, where the court held that the State Agency opinions were outdated because there were abnormalities in new records which revealed "significant and new developments" that "bear directly" on the claimant's functioning. *Id*. at 728. In this case, Plaintiff's records from Center for Pain Relief contained abnormalities that were significant and new developments not otherwise documented in the record (*i.e.*, the prescription for the cane). Thus, as in *Moreno*, because the State Agency did not consider any of these session notes or recorded abnormalities or Plaintiff's prescribed cane, their opinions are out of date. Additionally, the State Agency opinions do not reflect a proper review of the evidence. Thus, for the foregoing reasons, the State Agency opinions cannot salvage the ALJ's errors.

Plaintiff contends that the ALJ erred in crafting Plaintiff's RFC. The ALJ concluded that the Plaintiff had the ability to perform:

> sedentary work as defined in 20 CFR 404.1567(a) and 416(a) except that she needs a sit/stand option and she is not able to climb ladders, ropes, or scaffolds or crawl at all. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and reach overhead with either of her upper extremities. She can frequently handle and finger and she must avoid exposure to extreme heat and cold, wetness, humidity, noise, vibrations, fumes, odors, dust, gases, poorly ventilated areas, and hazards, such as dangerous machinery and unprotected heights."

(Tr. 16.) Plaintiff contends that this assessment is not a proper RFC, as the Agency requires a function-by-function analysis. *See* SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996) ("The RFC

assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in [20 C.F.R. § 404.1545(b)-(d)]. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, . . .") Here, the ALJ did not "first identify the individual's functional limitations or restrictions and assess her work-related abilities on a function-by-function basis." Thus, the ALJ did not provide a function-by-function RFC as required by the Agency.

Also, the description of "sedentary work as defined in 20 C.F.R. § 404.1567(a)" does not constitute an RFC pursuant to Agency requirements. *See* SSR 96-8p at *1 (RFC is "the most Plaintiff can do). 20 C.F.R. § 404.1567(a) defines "sedentary" as:

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Id*. "A certain amount of walking and standing" is not a specific finding to ascertain the most Plaintiff can do. Neither is "involves sitting." Because the ALJ did not properly assess Plaintiff's RFC, the ALJ's Decision is not supported by substantial evidence.

This is particularly critical because in this case there is no accurate and logical bridge from the evidence to the ALJ's "sedentary" finding. The ALJ erroneously states "claimant's physical examination findings have been largely within normal limits since the alleged onset date" (Tr. 18). Yet, the ALJ goes on to list extensive examples of abnormal findings including:

> obesity (with a body mass index ranging from 43 to 54), an antalgic gait, slow movements, difficulty hopping and squatting, spasms in her back, decreased pulses in her feet, multiple tender points, high blood pressure, trace edema, difficulty standing on her heels and toes and tandem walking, decreased sensation in her right arm and hand, positive cervical and lumbar facet loading, positive SLR,

> positive Spurling's, positive Patrick's test, positive Torque test, positive Flip's
> test, positive Tinel's sign over the occiput, positive Tinel's and Phalen's signs over
> the right hand/wrist, and decreased range of motion in her neck, back, shoulders,
> hips, knees and ankles.

(*Id*.) Thus, it appears that the ALJ placed more emphasis on unidentified, "largely" normal findings to the exclusion of multiple, consistent, abnormal findings. Thus, the ALJ failed to create a logical bridge and the Decision is not supported.

Likewise, the ALJ erred in her consideration of Dr. Frigo's functional capacity evaluation. Plaintiff underwent a functional capacity evaluation in July 2015, which demonstrated that Plaintiff was not capable of even a full range of sedentary work. (Tr. 1338-53.) The ALJ dismissed this "because it indicated that just 5 out of 23 validity criteria was passed, suggesting she gave poor effort during this evaluation" (Tr. 19). However, the ALJ failed to also consider that the evaluator himself reasoned that Plaintiff's "anxiety regarding increased pain with activities may contribute to her less than full effort during testing" and that the evaluator himself did not find evidence of symptom exaggeration. (Tr. 1338, 1349.) Thus, the ALJ erred in her consideration of this evidence and its impact on Plaintiff's RFC.

The Commissioner cites generalities from SSR 96-9p in her attempt to justify the ALJ's error. However, this cannot serve as a defense. First, the RFC must be the most this particular claimant can do. SSR 96-8p, 1996 WL 374184 at *1. And, the generalities in SSR 96-9p do not explain the particulars in this case. *Burnett*, 220 F.3d at 125 (speculation is not substantial evidence). Second, an ALJ must build an accurate and logical bridge from the evidence to the conclusion. Here, without a proper analysis or proper definition of Plaintiff's functioning, there is no accurate and logical bridge. This is particularly critical given the nature of Plaintiff's

conditions and how they would affect her ability to sit, stand, and walk. Third, the Commissioner's reliance on the State Agency opinions is misplaced for the reason identified above. And, in any event, the ALJ implicitly rejected the State Agency opinions by finding greater limitations. Thus, they cannot serve as support for the ALJ's error. Therefore, remand is necessary for proper consideration of Plaintiff's RFC consistent with Agency regulations.

The Commissioner focuses on Mr. Frigo's finding that Plaintiff had "exaggeration behavior during the static testing on BTE of material handling capabilities" as support for all aspects of the ALJ's Decision. (Tr. 1338.) The emphasis is misplaced. This was only one statement in a portion of an extended evaluation. (Tr. 1338-53.) In fact, the most critical findings are found under the RECOMMENDATIONS section, summarizing the entire exam, which states:

1.     It does appear patient has difficulty with work demands tested during this evaluation, but demonstrates improved effort with distraction.

2.     Patient should seek assistance for anxiety and depression.

3.     Her anxiety regarding increased pain with activities may contribute to her less than full effort during testing.

(Tr. 1338.) All of Mr. Frigo's final recommendations were somehow related to Plaintiff's mental functioning and its impact on her abilities. Moreover, another aspect of Mr. Frigo's report undermines the ALJ's conclusion. Even after noting that her pain was out of proportion to her movement pattern, Mr. Frigo nevertheless still noted: "Symptom exaggeration does not appear to be present." (Tr. 1349) (emphasis added.) Thus, contrary to the Commissioner's suggestion, Mr. Frigo's report bolsters Plaintiff's claim and lends critical support to the impact her mental functioning has on her disability. As such, the ALJ erred in her consideration of this evidence and its impact on Plaintiff's RFC.

37

Clearly, the ALJ's RFC fails because it neither complies with applicable Agency regulations and rulings nor the Seventh Circuit's requirements to build an accurate and logical bridge.

Plaintiff also contends that the ALJ's sit-stand option was not properly assessed. The ALJ concluded that Plaintiff could perform sedentary work, except that she needs a sit/stand option". (Tr. 16.) However, the ALJ does not specify the frequency of Plaintiff's need to alternate between sitting and standing. Agency rulings provide that the "RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing." SSR 96-9p, 1996 WL 374185 at *7 (July 2, 1996). Here, the ALJ merely stated that Plaintiff "needs a sit/stand option" and makes no specific findings as to the frequency as required by SSR 96-9p. This is critical because, as explained in this ruling, "[w]here this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded." *Id.* Because the ALJ's RFC does not specify the frequency of Plaintiff's need to alternate sitting and standing, remand is necessary for a proper determination.

Plaintiff also claims that it is questionable if this assessment would even provide for work. A sit-stand option, like the one provided by the ALJ here, constitutes a "reasonable accommodation" according to the United States Equal Employment Opportunity Commission (EEOC) standards because it is a modification to the job as it is described. *See* U.S. Equal Empl. Opportunity Comm'n, EEOC Enforcement Guidance Notice No. 915.002, *Enforcement Guidance: Reasonable Accommodations and Undue Hardship Under the Americans with Disabilities Act* (2002), available at https://www.eeoc.gov/policy/docs/accommodation.html. The EEOC provided an example of a reasonable accommodation identical to this case:

A cashier easily becomes fatigued because of lupus and, as a result, has difficulty making it through her shift. The employee requests a stool because sitting greatly reduces the fatigue. This accommodation is reasonable because it is a common-sense solution to remove a workplace barrier being required to stand when the job can be effectively performed sitting down. This 'reasonable' accommodation is effective because it addresses the employee's fatigue and enables her to perform her job.

*Id.* at Example B. Thus, according to the EEOC, the RFC's inclusion of such a significant sit-stand option constitutes a reasonable accommodation under the ADA and, as a result, any job that requires such accommodation for sitting and standing cannot be used to deny the claimant benefits. *See* SSR 00-1c, 2000 WL 5889 (Jan. 7, 2000) ("[W]hen the SSA [Social Security Administration] determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account … [A]n ADA suit claiming that the [claimant] can perform her job with reasonable accommodation may well prove consistent with an SSDI claim that the [claimant] could not perform her own job (or other jobs) without it."); *Sullivan v. Halter*, 135 F. Supp. 2d 985, 987-88 (S.D. Iowa 2001) ("Whether or how an employer might be willing, or required, to alter job duties to suit the limitations of a specific individual is not relevant because Social Security's assessment must be based on broad vocational patterns rather than on any individual employer's practices.") (citation and internal punctuation omitted).

In support of the ALJ's Decision, the Commissioner asserts that "at will" was "reasonably implied", and that some courts have found that "at will" is sufficient. As Plaintiff points out, the Commissioner's position amounts to pure speculation, which is not substantial evidence. *Burnett*, 220 F.3d at 125. This strongly suggests that the VE was also speculating about the frequency of the sit/stand option which cannot serve as suport. This Circuit requires that the hypothetical provided to the VE be specific and incorporate all of the claimant's limitations. *Indoranto v.*

*Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Further, SSR 00-4p explains that ALJs may not rely on evidence provided by a VE if that evidence is based on underlying assumptions. Also, there is no logical bridge to suggest that Plaintiff could perform that activity in a work setting, every day, on a regular and continuing basis. Independent of SSR 96-9p, SSR 96-8p states that the RFC must be the most the claimant can do and that the ALJ must carefully consider an individual's ability to perform the "specific" work-related functions. Here, the ALJ's sit-stand option is not specific. Given that SSR 83-12 suggests that Plaintiff cannot perform most sedentary or light jobs (because of her need to have the option to sit or stand at will and her ability to perform only unskilled work), this Court cannot assume that the ALJ's finding that Plaintiff can perform a significant number of jobs in the economy was supported. *Boone v. Barnhart*, 353 F.3d 203, 210-11 (3rd Cir. 2004) ("SSR 83–12 suggests that Boone cannot perform most sedentary or light jobs (because of her need to have the option to sit or stand at will and her ability to perform only unskilled work), we cannot – as the Commissioner would have us do – assume that the ALJ's finding that Boone can perform a limited range of light work means that she can perform a significant number of jobs in the economy.") Thus, the ALJ erred in crafting the unspecified, sit/stand option.

Interpreting the RFC as the Commissioner does, supposes that the employee, not the employer, has "broad flexibility." *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008). This "broad flexibility" is not typical of work settings. This is particularly critical because the RFC's inclusion of such a significant sit-stand option constitutes an accommodation. The Commissioner suggests that the ALJ need not address whether this sit-stand option was a reasonable accommodation because the VE testified that jobs exist with the purported limitations. This is not a defense. First, this based on pure speculation by the Commissioner, which cannot

serve as substantial evidence. Second, the fact that a job "exists" with a reasonable accommodation does not equate to a proper finding that Plaintiff could perform a significant number of jobs. Nowhere did the VE address "reasonable accommodations" in her testimony. Nowhere did the VE affirmatively state that a sit-stand option was not a reasonable accommodation. Rather, the VE simply testified that jobs existed. However, the issue is not whether jobs exist, but whether the job exists because it is performed with a reasonable accommodation. And in any event, as noted above, regardless of the VE testimony, there simply is no support or accurate and logical bridge for the ALJ's unspecified sit/stand option.

Plaintiff also asserts that the ALJ's RFC fails to address Plaintiff's use of an ambulatory aid. As noted above, Plaintiff was prescribed a cane and there is evidence that Plaintiff uses the cane. The ALJ, however, never considered what effect Plaintiff's use of a cane (Tr. 48, 269) would have on her ability to work. *See, e.g., Grube v. Colvin*, No. 1:14-cv-01294-DKL-RLY, 2015 WL 5672645, at *6 (S.D. Ind. Sept. 24, 2015) (remanding case where the ALJ erred in considering the use of a cane and explaining that while the claimant "might not need the cane on good days, she may need it on bad days"). Thus, the ALJ's RFC is unsupported as it does not accommodate for Plaintiff's use of a cane. Accordingly, remand is necessary for the ALJ to properly address Plaintiff's physical abilities and how this would impact Plaintiff's ability to perform work.

Next, Plaintiff argues that the ALJ's RFC fails to accommodate Plaintiff's deficits in understanding, remembering, and applying information, maintaining concentration, persistence or pace, and in interacting with others. As noted above, the ALJ erred in finding moderate and mild limitations in the "B Criteria." This resulted in flawed Step Two determination, that in turn,

infected the remainder of the Decision (*i.e.*, the "B Criteria" and the RFC). However, even assuming that moderate limitations were supported, the ALJ's RFC still fails to accommodate these moderate limitations. Specifically, the ALJ limited Plaintiff to simple, routine, repetitive tasks and instructions that do not involve more than occasional changes (and these changes must be gradually introduced), no assembly-line pace work, and only occasional interactions with the general public (Tr. 16). However, this fails to fully account for Plaintiff's mental limitations. For example, the ALJ's restriction that Plaintiff is "limited to simple, routine, repetitive tasks and instructions that do not involve more than occasional changes (and these changes must be gradually introduced)" does not fully accommodate deficits in concentration, persistence or pace. *See e.g., Moreno*, 882 F.3d at 730 (rejecting Commissioner's claim that "the ALJ's reference to simple work instructions and to routine, low-stress work 'reasonably accommodated Moreno's moderate difficulties in concentration, persistence or pace.' We cannot accept this argument. '[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace.' ") (citations and footnote omitted); *O'Connor-Spinner*, 627 F.3d 614, 620 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft*, 539 F.3d at 677-78. In the present case, there is a substantial body of evidence documenting Plaintiff's deficits in concentration, persistence or pace, such that restricting only "simple, routine, repetitive tasks and instructions that do not involve more than occasional changes (and these changes must be gradually introduced)" is insufficient. Additionally, the record demonstrates that Plaintiff has deficits in concentration. In late 2010, a mental exam marked deficits in: poor concentration. (Tr. 990.) She "can only

42

concentrate for small periods of time due to an increase in the panic attacks and migraines." (Tr. 380.) She had difficulty focusing at work (Tr. 402.). Her past employer noted that she "often came to work unable to concentrate on duties, sometimes dozed off at work station." (Tr. 394).

Moreover, courts have repeatedly held that the ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity. *See, e.g., Stewart*, 561 F.3d at 684-85; *Craft*, 539 F.3d at 677; *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); see also SSR 85-15, 1985 WL 56857 (Jan. 1, 1985) ("Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's [mental] condition may make performance of an unskilled job as difficult as an objectively more demanding job."). Notwithstanding this well-settled, controlling precedent, the ALJ failed to properly account for Plaintiff's deficiencies in concentration, persistence or pace in her Decision. Plaintiff's prior employer noted that she "didn't take the necessary time to find and correct errors on daily reports before closing." (Tr. 395). She was sent home on two occasions due to "inability to communicate with guests and stay awake." (Tr. 396). Plaintiff's anxiety and "nervous breakdowns" have affected her ability to concentrate and complete tasks. (Tr. 494, 502). These are merely a few examples present in the record. As a whole, the record demonstrates that Plaintiff is unable to maintain concentration, persistence and pace. Thus, the ALJ's RFC assessment fails to accommodate for Plaintiff's limitations.

Also, the ALJ failed to properly account for Plaintiff's ability to accommodate to the stress and demands of work and work-like settings. In this regard, SSR 85-15 is instructive, and provides:

> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirement of even so-called "low stress" jobs.
>
> Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job, for example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demand of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may be not able to work even in the absence of close supervision; the knowledge that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerated for some mentally impaired persons. Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

SSR 85-15, 1985 WL 56857, at *6. This is critical given the evidence related to Plaintiff's inability to handle stress and changes as noted above. (*See also* Tr. 39 (she has breakdowns and cannot function under stress), Tr. 48 (she has to make more medications during stressful times), Tr. 45 (she gets overwhelmed with the stress of dealing with people), Tr. 382, 392, 424, 432, 495, 503, 549, 557 (does not handle stress well).) The record shows that Plaintiff does not handle stress well. Thus, the ALJ's failure to accommodate for this in the RFC is reversible error.

For the foregoing reasons, the ALJ's RFC fails to accommodate Plaintiff's mental functioning limitations. Similarly, the ALJ's restriction that Plaintiff can have frequent interactions with co-workers and only occasional interactions with the general public (Tr. 16) fails to fully account for Plaintiff's social limitations for two keys reasons. First, the ALJ's RFC fails

to address what Plaintiff's limitations are regarding supervisors. The ALJ provides no discussion as to why Plaintiff would need limitations with co-workers and the general public, but not with supervisors. Thus, the ALJ failed to build an accurate and logical bridge. Second, the evidence demonstrates that Plaintiff's functioning is not adequately encompassed in the RFC. For example, Plaintiff is unable to engage in groups of people and cannot attend activities because of it. *(See, e.g.*, Tr. 502, 548, 556, 1293.) She has trouble being around people, regardless of the size of the group. (Tr. 55- 56.) She is overwhelmed with the stress of having to communicate with people. (Tr. 45.) She has panic attacks two to three times a week. (Tr. 57.) She will need complete silence and isolation. (*Id.*) Noise bothers her all the time. (Tr. 57, 502.) This evidence is not adequately encompassed in the ALJ's RFC. It is well-settled that an ALJ must explain why she does not credit evidence that would support strongly a claim of disability, or why she concludes that such evidence is outweighed by other evidence. *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488 (7th Cir. 2007); *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001).

For the foregoing reasons, this court finds that the RFC fails to account for Plaintiff's deficits in mental functioning. This error warrants remand for a proper determination of Plaintiff's RFC, along with the ALJ's Step Five determination. *Vargas v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (the Seventh Circuit noted that "in this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record"); *see also Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor-Spinner*, 627 F.3d at 619. For the foregoing reasons, the ALJ's RFC is not supported by substantial evidence and remand is necessary for a proper determination.

The Commissioner entirely fails to address how the ALJ's RFC fails given Seventh

Circuit's precedent requiring that RFCs fully accommodate deficits in mental functioning. This is particularly critical given the evidence presented (*i.e.*, regarding Plaintiff's limitations in concentration, persistence or pace, social functioning, and her failure to handle stress and changes) and controlling Seventh Circuit precedent. *See Radosevich v. Berryhill*, — Fed. Appx. —, 2019 WL 286172, *3 (7th Cir. Jan. 22, 2019). The ALJ's RFC is not supported and remand is necessary.

Next, Plaintiff argues that the ALJ erred in assessing Plaintiff's statements. A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). Here, the ALJ determined that Plaintiff was not credible because the medical records did not fully support her allegations. Given the facts in this case, this is not a proper credibility determination. *See* SSR 96-8p, 1996 WL 374184 at *5 ("Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone.").

Plaintiff argues that while the ALJ did review some of the medical evidence, the objective findings cannot serve as a basis for dismissing Plaintiff's statements. Plaintiff claims that the ALJ fundamentally misunderstood Plaintiff's conditions, and this overarching error further manifested itself in a flawed credibility determination. Thus, even the evidence that the ALJ did consider cannot serve as substantial evidence for her credibility determination. Plaintiff also claims that the ALJ's use of selective objective evidence to suggest that Plaintiff's symptoms are uncorroborated, is itself unsupported. *See Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) (the ALJ erroneously believed that "complaints of pain, to be credible, must be confirmed by diagnostic tests."). The

ALJ failed to properly analyze and discuss the abnormal findings from exams, all of which support Plaintiff's statements; thus, highlighting only normal findings cannot serve as substantial evidence. Pain is not measured on objective testing. *See Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("Pain is always subjective."). The ALJ did not address any of the other evidence corroborating Plaintiff's symptoms as previously identified herein. Thus, Plaintiff concludes that the medical evidence the ALJ reviewed is not a proper basis for discrediting the Plaintiff.

Plaintiff further claims that the ALJ erred in minimizing Plaintiff's statements regarding treatment and emergency room visits. The ALJ did not consider any of the possible explanations documented in the record which shed light on Plaintiff's treatment history. The ALJ's failure to consider this evidence before dismissing Plaintiff's statements and conditions is reversible error. An ALJ may not "draw inferences about an individual's symptoms and their functional effects from a failure to seek treatment without first considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996). Although SSR 96-7p was rescinded and replaced by SSR 16-3p in March 2016, the Agency still maintained that there are many possible reasons an individual may not have pursued treatment, and that the ALJ "will" consider and address a claimant's reasons for not pursuing treatment. *See* SSR 16-3p, 2017 WL 5180304, at *9-10 (Oct. 25, 2017). The ALJ here did not consider any explanations relevant to this determination; thus, remand is warranted. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (collecting cases).

It is undisputed that, Plaintiff suffers from diagnosed mental illness, which required intervention. "Many individuals with mental health problems are hesitant to seek mental health

treatment for legitimate reasons." *Hill v. Astrue*, Case No. 1:08-cv-0740-DFH-JMS, 2009 WL 426048, at *9 n. 5 (S.D. Ind. Feb. 20, 2009). And, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). The same is true for Plaintiff's physical conditions. Axis III is used "for reporting current general medical conditions that are potentially relevant to the understanding or management of the individual's mental disorder." DSM-IV-TR at 29. On multiple occasions, Plaintiff was diagnosed with medical conditions on Axis III. (See e.g., 1014, 1018, 1321.) This is objective evidence of how Plaintiff's condition would affect her treatment. And, Ms. Escobar opined as to interrelatedness as well. (Tr. 1704.) Thus, the ALJ erred in dismissing Plaintiff's statements without first considering how Plaintiff's illnesses would reasonably interfere with her treatment.

The record documents that Plaintiff requires assistance from others with respect to her treatment and sessions. Plaintiff does not drive. (*See e.g.*, Tr. 199.) Specifically, she does not drive because of her anxiety and panic attacks. (Tr. 38-39.) Further, she does not drive because she cannot feel the pedals beneath her feet due to the neuropathy and cannot sit in one position for long. (Tr. 39.) She cannot go out alone and needs someone to accompany her. (Tr. 379-80, 389-90, 415, 421, 430, 493, 500-01, 546-47, 554-55, 1030.) This is direct evidence of Plaintiff's inability to independently manage her care and attend appropriate treatment independently. *See* SSR 16-3p, 2017 WL 5180304 at *10 (An individual may not have access to medical services.) The ALJ's failure to consider this before dismissing Plaintiff's statements and conditions is reversible error.

The very nature of Plaintiff's case—a Title XVI Supplemental Security Income (SSI)

claim, which by definition, requires that the individual have limited finances—reflects Plaintiff's financial hardship. It is undisputed that SSI benefits require a showing of both disability and financial need. *See* 42 U.S.C. § 1381a. Plaintiff was already determined eligible based on her financial hardships, inasmuch as she was denied by the Agency for her purported lack of disability, and not due to financial eligibility. As such, the Agency itself has already concluded that Plaintiff suffers financial need. It is common knowledge that many individuals who have already met the Agency's threshold of financial need often struggle to afford housing, food, clothing, and medical treatment, and this affects their mental impairments.

There are multiple references to Plaintiff's finances and struggles with insurance. (*See e.g.*, Tr. 993, 997, 1106, 1234.) This is best emphasized in a report by one of Plaintiff's providers, who noted that Plaintiff's finances were an issue. (Tr. 1664.) This is also demonstrated in Plaintiff's diagnoses. Axis IV is used "for reporting psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders." *See* DSM-IV-TR at 31. In this case, on one occasion, Plaintiff was diagnosed with "Inability to pay for medications, Inability to access healthcare resources…" on Axis IV. (Tr. 1014.) On another occasion, Plaintiff was diagnosed with "Financial" on Axis IV. (Tr. 1018.) On a third occasion, Plaintiff was diagnosed with "limited support, financial problems" on Axis IV. (Tr. 1321.) This is objective evidence demonstrating Plaintiff's financial difficulties and problems in accessing treatment. The ALJ's failure to consider this before dismissing Plaintiff's statements and conditions is reversible error. *See Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1096 (E.D. Wis. 2001) ("In the absence of such evidence, the ALJ made his own independent medical determination about the appropriateness of doctor visits. This determination was not within the ALJ's province to

make.").

Despite being required to do so under Agency regulations, the ALJ never considered any explanations that might explain why Plaintiff had routine treatment and may not have had more treatment. Thus, the ALJ erred in dismissing and minimizing Plaintiff's allegations, and in doing so, committed reversible error. *Hargrove v. Berryhill*, Case No. 1:16-cv-1922-JMS-MJD, 2017 WL 3172917, at *4 (S.D. Ind. June 30, 2017) adopted by 2017 WL 3153582 (S.D. Ind. July 25, 2017) ("Without some explanation of why Hargrove had compliance issues and inconsistent treatment, the ALJ was not permitted to discount Hargrove's credibility on these grounds."). Thus, the ALJ's credibility determination cannot be supported by substantial evidence.

While the ALJ does identify some factors, these factors do not salvage the ALJ's Decision. For example, the considering Plaintiff's "daily activities." The ALJ found that Plaintiff's daily activities (i.e., provide food and water to her pet, take her medications with reminders, count change, use a phone, play cards and board games, wash dishes, prepare simple meals, etc.) did not support a more restrictive assessment. (Tr. 18.) This is an improper basis. First, the ALJ failed to adequately explain how Plaintiff's minimal daily activities were inconsistent with her testimony of disabling limitations. *Laggner v. Comm'r of Soc. Sec.*, Case No. 1:14-cv-272-SLC, 2016 WL 1237882 at * 11 (N.D. Ind. Mar. 30, 2016). Plaintiff testified that she can perform activities, but only when she is not having pain or a flare-up. Consequently, the ALJ's comment about Plaintiff's "daily" living activities cannot be viewed as supporting the credibility determination. *See Jelinek*, 662 F.3d at 812 ("[A]n ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."). Also, there is no basis to suggest that

Plaintiff's ability to perform the above activities diminishes her credibility. *See* 20 C.F.R. Listing 12.00(D)(3)(a) ("We will consider the complete picture of your daily functioning, including the kinds, extent, and frequency of help and support you receive, when we evaluate your mental disorder and determine whether you are able to use the four areas of mental functioning in a work setting.").

As the Seventh Circuit has noted, these tasks "differ dramatically" from the type of jobs the ALJ believed Plaintiff was capable of performing, *see Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006), and lend no support to the conclusion that she would be able to spend eight hours a day, every day, doing consistent work activity. Plaintiff reported that, depending on the severity of her symptoms from day to day, she may be able to do one to three hours of household chores for ten to fifteen minutes at a time or may need "total assistance". (Tr. 378). Plaintiff's function reports demonstrate that she is able to complete her activities of daily living (on good days) by significantly pacing herself and taking multiple hour-plus long rest periods. (Tr. 376, 426, 442, 497). Further, Plaintiff's activities and the level of performance (preparing simple meals, reading, using the computer, watching TV, listening to music, feeding dog) are not inconsistent with her level of disability.

These daily activities do not suggest, as the ALJ erroneously found, that the daily activity is performed independently, effectively and appropriately. SSR 16-3p, 2017 WL 5180304, at *9 ("An individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms."); SSR 96-7p, 1996 WL 374186, at *8 (claimants may sometimes have structured daily activities to minimize symptoms and avoid physical and mental stressors). In this case, there are qualifications

to these activities, best detailed in the multiple Function Reports (Tr. 376-83, 386-93, 418-25, 426-33, 489-96, 543-50), which show that these activities are not performed independently, appropriately, or on a sustained basis. *See Thompson*, 722 F. App'x at 582 (remanding because in failing to note the significant qualifications, the ALJ did not accurately depict the third-party report and, thus, the entire decision lacked substantial support). On bad days, Plaintiff may need "total assistance" with her activities of daily living. (Tr. 378). While she can prepare cold sandwiches and microwave food, she needs assistance to prepare meals (Tr. 377, 386, 388, 428). Plaintiff can do some laundry "with help" and cares for her dog with the help of her teenage daughter (Tr. 377, 386-87). Contrary to the ALJ's finding, the record shows that Plaintiff receives considerable help and support in her daily functioning.

The ALJ also attempts to minimize Plaintiff's statements in light of her attempts at work after the alleged onset date. (Tr. 18.) This cannot support the ALJ's credibility assessment. First, these were all failed attempts in that they did not last sufficiently or provide for consistent work. Thus, rather than minimize her testimony, this evidence serves to bolster it. Second, this evidence cannot support a negative credibility finding. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) ("The fact that Roddy pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain, does not preclude her from establishing that she was disabled."); *see also Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017). Plaintiff struggles to work even only a handful of hours a week. (Tr. 38-39.) Moreover, as already addressed above, Plaintiff has limited income and the ALJ never considered how much Plaintiff struggled financially. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) ("a claimant's dogged efforts to work beyond her physical capacity would seem to be highly relevant in deciding her

credibility and determining whether she is trying to obtain government benefits by exaggerating her pain symptoms"). Thus, this credibility finding by the ALJ is erroneous and must be reconsidered.

The ALJ found that Plaintiff is not entirely consistent because she previously filed for benefits and failed to pursue all possible appeals on these prior claims. (Tr. 18.) The ALJ failed to build an accurate and logical bridge in this regard. First, all times therein, Plaintiff alleged that she was disabled. Thus, her prior applications are not inconsistent with each other. Second, the mere fact that Plaintiff may not have pursued all possible appeals on her prior claims does not suggest an inconsistency. As a practical matter, there may be a plethora of reasons why claimants cannot pursue appeals of their disability claims at any given time. Here, many reasons exist why Plaintiff may not have been able to pursue all possible appeals. First, in her first application in 2010, Plaintiff was unrepresented. (Tr. 77.) Thus, she may not have been aware of the ramifications of such action. Second, Plaintiff suffers from mental illness, and thus may not have understood the ramifications of not appealing the denials. *See* SSR 91-5p, 1991 WL 208067 (July 1, 1991). Third, as noted above, Plaintiff is dependent on others to provide her transportation. And, as noted in the record, Plaintiff had difficulty finding transportation to the hearing. (Tr. 199.) Fourth, SSA "decision making process is uncertain and quite lengthy." *Moorhaus v. Comm'r of Soc. Sec.*, Case No. 1:15-cv-234, 2016 WL 1028040, at *5 (W.D. Mich. Mar. 15, 2016) (citations omitted.) Thus, in this regard, the ALJ failed to build an accurate and logical bridge in concluding that Plaintiff was not credible because she filed previous applications and did not pursue all possible appeals. Speculation is not substantial evidence. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 125 (7th Cir. 2000). Thus, this credibility finding by the ALJ is erroneous

and must be reconsidered.

Additionally, and as already addressed in other respects herein, the ALJ virtually ignored all the evidence that bolstered Plaintiff's allegations. This is best demonstrated in the ALJ's failure to consider Plaintiff's employee performance evaluations. (Tr. 394-96, 400.) Each of these evaluations substantially bolster Plaintiff's statements and bases for disability. As the foregoing demonstrates, the ALJ provided no valid basis to discredit Plaintiff's statements. Accordingly, the ALJ's rejection of Plaintiff's statements is reversible error. *See Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001). Remand is necessary to address the ALJ's errors and to reevaluate Plaintiff's claim in light of a proper credibility determination. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014).

Clearly, the ALJ failed to make a proper credibility determination. While daily activities may be a proper factor to consider when analyzing a claimant's subjective evidence, the ALJ may, nevertheless, err in the application of that factor. There is no shortage of cases resulting in reversal where the ALJ erred in the application of the daily activities factor in the credibility determination. *See, e.g., Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Thus, the Commissioner's invocation of "proper factors" is misplaced and insufficient. And, in this case, the ALJ's focus on selective functioning (i.e., watching TV and coloring in an adult coloring book) is misplaced. The ALJ failed to properly consider the activities, failed to show how those activities diminished her credibility, and failed to show how they would support the ultimate Decision. The ALJ failed to build an accurate and logical bridge.

Contrary to the Commissioner's suggestion, the medical evidence the ALJ reviewed

cannot serve as a proper basis for discrediting the Plaintiff. The Commissioner's limited focus on the ALJ's consideration of objective medical evidence is misplaced. As noted earlier, the ALJ fundamentally misunderstood Plaintiff's conditions such that this error further manifested itself in a flawed credibility determination. Second, the evidence the ALJ reviewed is not a substitute for the evidence she ignored, or those that she reviewed improperly. Thus, the Commissioner's focus on the objective findings the ALJ considered is misplaced. Moreover, the ALJ's credibility determination fails because the ALJ drew negative inferences from Plaintiff's gaps in treatment. The Commissioner does not even address the issues presented by Plaintiff showing that the ALJ's Decision runs afoul of well-established Circuit precedent and Agency regulations. Likewise, the Commissioner does not address the ALJ's errors with regards to the ALJ's conclusions about Plaintiff's work attempts and previously filed claims.

Lastly, Plaintiff argues that the ALJ's ultimate decision is not supported by substantial evidence. It is the Agency's burden to show that there is other work in significant numbers. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). In this case, as demonstrated above, the RFC fails to account for Plaintiff's limitations and remand is necessary for a proper determination of Plaintiff's RFC. It also undermines the Step Five determination. In light of the ALJ's failure to properly consider all the evidence, there is no assurance that Plaintiff can perform the jobs identified by the VE. Generally, ALJs must provide a complete picture of a claimant's functional capacity to a VE so there is assurance that expert testimony regarding available jobs took into account all the relevant functional limitations. In *Vargas v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015), the Seventh Circuit noted that "in this circuit, both the hypothetical posed to the VE and

the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *See also Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor-Spinner*, 627 F.3d at 619. Here, as detailed above, the ALJ selectively reviewed the evidence, ignoring that which was most favorable to the Plaintiff. Consequently, the VE was not provided with all the relevant functional limitations. Accordingly, the ALJ failed to meet this burden in light of all the critical issues addressed above with regards to the ALJ's analysis of the evidence.

Because the ALJ failed to properly consider the impact of Plaintiff's impairments, the ALJ erred in finding that she could perform other work. Accordingly, for all the above reasons, remand is necessary

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Opinion.

 Entered: May 13, 2019.


s/ William C.  Lee
William C. Lee, Judge
United States District Court